## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| AMY J. REISINGER, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:25-cv-01854 |
| FORENSIC FLUIDS, INC. and | ) | **JURY TRIAL DEMANDED** |
| BRIDGET LORENZ LEMBERG, | ) | |
| Defendants. | ) | |

### COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND

Plaintiff Amy J. Reisinger ("Plaintiff Reisinger" or "Plaintiff"), for her Complaint against Defendants Bridget Lorenz Lemberg ("Defendant Lemberg") and Forensic Fluids, Inc. ("Defendant Forensic Fluids") (collectively "Defendants"), hereby alleges as follows:

### NATURE OF THE ACTION

1.      This is a civil action for infringement of United States Patent No. 9,366,685, United States Patent No. 9,817,006 and United States Patent No. 10,267,811 arising under the Patent Laws of the United States, 35 U.S.C §§ 271, *et seq.*

### PARTIES

2.      Plaintiff Reisinger is an individual who resides at 708 Chadwick Drive, Venetia, Pennsylvania 15367.

3.    On information and belief, Defendant Forensic Fluids is a corporation organized under the laws of the State of Michigan with its principal place of business at 225 Parson Street, Kalamazoo, Michigan 49009.

4.    On information and belief, Defendant Lemberg is Laboratory Director, Toxicologist, and Chief Executive Officer of Defendant Forensic Fluids, residing at 5860 12th Street, Portage, Michigan 49024.

## JURISDICTION AND VENUE

5.    This Court has personal jurisdiction over Defendants for at least the following reasons: (a) Defendant Forensic Fluid has it principal place of business in this District; (b) Defendant Forensic Fluid is incorporated under the laws of the State of Michigan; (c) Defendant Lemberg resides in this District; (d) Defendant Lemberg has systematic and continuous contacts with this District due to her position as Laboratory Director and CEO of Forensic Fluids; and (e) Defendants have committed acts of patent infringement in Michigan and this District, including at least by using, selling, and/or offering for sale infringing forensic toxicology services ("Accused Forensic Services"), namely, using methods for rapid and sensitive detection and quantification of drugs of abuse using oral fluid from post-mortem human subjects.

6.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 1400(b) because Defendant Forensic Fluids is incorporated under the laws of the State of Michigan, Defendants do business in this District, and Defendants have committed acts of infringement in this District.

**THE PATENTS-IN-SUIT**

7.      On November 14, 2017, the U.S. Patent and Trademark Office (USPTO) duly and legally issued U.S. Patent No. 9,366,685 ("the '685 Patent"), entitled "Rapid and Sensitive Method of Forensic Toxicology in Post-Mortem Subjects Using Oral Fluid Testing," to Plaintiff Amy J. Reisinger.  A true and correct copy of the '685 Patent is attached as Exhibit A.

8.      On June 14, 2016, the USPTO duly and legally issued U.S. Patent No. 9,817,006 ("the '006 Patent"), entitled "Rapid and Sensitive Method of Forensic Toxicology in Post-Mortem Subjects Using Oral Fluid Testing," to Plaintiff Amy J. Reisinger.  A true and correct copy of the '006 Patent is attached as Exhibit B.

9.      On October 17, 2017, the USPTO duly and legally issued U.S. Patent No. 10,267,811 ("the '811 Patent"), entitled "Rapid and Sensitive Method of Forensic Toxicology in Post-Mortem Subjects Using Oral Fluid Testing," to Plaintiff Amy J. Reisinger.  A true and correct copy of the '811 Patent is attached as Exhibit C.

10.     The '685, '006 and '811 Patents collectively are referred to herein as the "Asserted Patents."

11.     Plaintiff is the inventor and owner of all right, title, and interest in the Asserted Patents.

12.     Defendants do not have any license, authorization, consent, or permission from Plaintiff to make, use, offer to sell, or sell any goods and/or services embodying the subject matter of any claim of the Asserted Patents.

## FACTUAL BACKGROUND

13.    Plaintiff holds a Bachelor of Science degree in biological sciences, is a registered Histologist with the American Society for Clinical Pathologists and undertook post-graduate studies in Cardiovascular Perfusion Technology.  Plaintiff has nearly three decades of experience in the fields of clinical, pharmaceutical, and forensic toxicology.  This experience includes serving as Research Scientist at GlaxoSmithKline and as Study Director/Monitor at Bristol-Myers Squibb Company.  Plaintiff is a member of: (a) the Society of Toxicology (SOT);( b) the American College of Toxicology (ACT); (c) the International Association of Coroners & Medical Examiners (IAC&ME); (d) the Society of Forensic Toxicology (SOFT); (e) the American Society for Clinical Pathology (ASCP); and (f) the National Society for Histotechnology (NSH).  Plaintiff holds numerous prestigious accreditations, licenses, certifications, and permits from the Centers for Medicare & Medicaid Services (CMS); Clinical Laboratory Improvements Amendments (CLIA); College of American Pathology (CAP); International Organization for Standardization (ISO) 15189 and ISO/International Electrotechnical Commission (IEC) 17025:2017(E); American National Standards Institute Accreditation Board (ANAB); Pennsylvania Department of Health (PDOH); Occupational Safety and Health Association (OSHA); Women's Business Enterprise National Council (WBENC), Women Owned Small Business (WOSB), and Safety Health Achievement Recognition Program (SHARP).

14.    Plaintiff is a pioneer in the field of forensic toxicology; researching and developing novel methods for rapid and sensitive detection and quantification of drugs of abuse in post-mortem humans and live and deceased animals using oral fluid ("Patented Subject Technology"), which efforts have resulted in the issuance of the Asserted Patents, as well as granted patents in

the United Kingdom, Germany, France, Ireland, Belgium, Sweden, Finland, the Netherlands, and Turkey.

15.    In 2014, Plaintiff founded SteelFusion Clinical Toxicology Laboratory, LLC ("SteelFusion"), a high-complex toxicology laboratory specializing in a unique method of drug testing utilizing oral fluid in live and post-mortem humans and in live and deceased animals.[1] Upon founding SteelFusion, Plaintiff recognized the nationwide opioid drug epidemic as an area that was underserved by the current network of testing laboratories, as the ever-increasing rate of overdose deaths had overwhelmed many of the country's coroners and medical examiners. Plaintiff appreciated that the predominantly county-run offices operated on lean fixed budgets due to dramatic increases in overdose deaths, which consumed a disproportionate percentage of annual budgets and resulted in budgetary overruns and financial crises for many of the smaller, poorly funded counties.  In response, to better serve those impacted by this crisis, Plaintiff researched and then developed rapid methods for the collection, detection, and quantification of oral fluid for toxicology testing in post-mortem humans and in live and deceased animals, said methods having surprising sensitivity and specificity that correlated as well as, and in most instances, better than blood, urine, bile, and liver tissue matrices.

16.    Coroners, medical examiners, and veterinarians traditionally rely upon numerous sample matrices such as blood, urine, vitreous, and tissue samples which require invasive collection and lengthy sample preparation procedures, delaying reporting of results for weeks and even months.  By contrast, Plaintiff Reisinger's Patented Subject Technology provides a non-

---

[1] SteelFusion is an acronym for "Saliva Technology Excellence with Expert Leadership Fusing Old Ideologies with New Ones."

invasive collection method and a rapid and sensitive testing methodology that delivers reporting of quantitative results within forty-eight hours. This has led, and continues to lead, to significant cost savings for strained county budgets by reducing the volume of required human autopsies while increasing the efficiency with which causes of deaths are determined, thereby freeing personnel and other resources to be reallocated.  Moreover, the rapid turnaround time of toxicology results also facilitates family members to reach closure, to make final arrangements, and to process insurance claims.  Likewise, Plaintiff's Patented Subject Technology assists veterinarians in caring for abused animals and to investigate animal poisoning cases.  Plaintiff and her co-workers understood that her discovery of the use of oral fluid in post-mortem subjects was a foundational breakthrough in the field of forensic toxicology for rapidly and effectively detecting and quantifying drugs of abuse in oral fluid from post-mortem humans and from live and deceased animals.

17.    Prior to Plaintiff's development of the Patented Subject Technology, it was not thought possible to detect and quantify drugs of abuse using oral fluid as a matrix from post-mortem subjects.  Rather, blood, urine, bile, vitreous, and liver tissue were some of the matrices used for forensic toxicology in deceased subjects; and blood, urine, and oral fluid solely were used for drug testing in live subjects.  Coroners, medical examiners, and pathologists, however, had a need for a less invasive but sensitive method to detect and quantify drugs of abuse in post-mortem subjects.  The conventional thinking was that oral fluid was not a viable matrix to detect and quantify drugs of abuse in deceased subjects because of the belief that there would be little oral fluid remaining in a deceased subject's oral cavity and that the concentrations of drugs of abuse obtained from such oral fluid would not accurately reflect concentrations of the drugs of abuse

found in the deceased subject's body using the other, mostly invasive, matrices.  Hence, oral fluid was never used or even contemplated for use in post-mortem subjects.

18.     The Asserted Patents are directed to methods for rapidly collecting, detecting, and quantifying non-naturally occurring drugs in oral fluid from post-mortem human subjects using liquid chromatography-mass spectrometry/mass spectrometry (LC-MS/MS instrumentation.  The Asserted Patents describe that, *inter alia*, oral fluid collection from various sites of a human deceased's oral cavity is not only an equivalent, but is a superior, alternative to traditional methods of fluid and tissue collections for post-mortem drug analysis due to the ease of collection, simpler use of instrumentation, safety concerns, and rapidity and quality of results obtained.  In addition, Plaintiff's Patented Subject Technology has been published in the Journal of Applied Technology May 7, 2019 (the "JAT Paper"), in which Plaintiff stated that "[t]he time has come to provide an alternative matrix for key stakeholders as well as access to real-time data from the detection and quantification of medicinal and illicit drugs in apparent or suspected drug deaths."  (Reisinger, A.J. *et al. Oral Cavity Fluid as an Investigative Approach for Qualitative and Quantitative Evaluations of Drugs in Postmortem Subjects. Journal of Analytical Toxicology*, May 17, 2019, 43:444–451, attached as Exhibit D.

19.     On October 30, 2022 through November 5, 2022, the Society of Forensic Toxicology (SOFT) held its annual conference in Cleveland, OH.  Plaintiff Reisinger hosted a booth for her SteelFusion forensic toxicology laboratory at the conference.  During the conference, Defendant Lemberg stopped at the SteelFusion booth and spoke with Plaintiff for about forty-five minutes regarding Plaintiff's oral fluid technology testing of drugs of abuse in post-mortem subjects.  In addition, on November 2, 2022, during the SOFT conference, an Oral Fluid Committee Meeting was held with both Plaintiff and Defendant Lemberg in attendance.  At the

meeting, one of the members questioned whether oral fluid in human decedents could be used to test for drugs of abuse.  The Chairman of the meeting, Curt Harper, PhD, stated that he was not sure that this was being done.  Plaintiff then raised her hand and stated that her laboratory, SteelFusion, currently was conducting oral fluid testing for drugs of abuse in human decedents with the use of her patented technology.

20.    On information and belief, since March 30, 2024, Defendants have been infringing all of the claims in the Asserted Patents by offering forensic toxicology services in this District and throughout the United States using the Patented Subject Technology to at least coroners and medical examiners to test drugs of abuse in oral fluid from post-mortem human subjects, as evidenced in Defendant Forensic Fluids' CLIA Certification of Compliance having an effective date of March 30, 2024 and an expiration date of March 29, 2026.  A true and correct copy of this CLIA Certificate of Compliance is attached as Exhibit E.

21.    Exhibit F is a screenshot of a PDF retrieved from Defendant Forensic Fluids' website titled "How to Collect Oral Fluid Quantisal Collection Device- For Postmortem Samples;" showing the use of a Quantisal collection device and the use of a collection pad placed sublingually in a postmortem subject's buccal cavity (https://forensicfluids.com; retrieved October18, 2025).

22.    Exhibit G is a screenshot of a webpage from Defendant Forensic Fluids' website showing that they use enzyme linked immunosorbent assay (ELISA) for all drug screens and LC/MS/MS quantification for confirmation. (https://forensicfluids.com/accuracy-reliability; retrieved October 21, 2025).

23.    Exhibit H is a screenshot of a PDF retrieved from Defendant Forensic Fluids' website titled "Postmortem Oral Fluid Drug List," stating: "All positives confirmed by

LC/MS/MS. Positive results are available in 24 hours or less," and providing a list of drugs that it can test.

24.     Exhibit I is a screenshot of the PDF retrieved from Defendant Forensic Fluids' website titled "Advantages of Postmortem Oral Fluid Drug Testing" showing, *inter alia*, that Defendants can test for over 180 drugs with a turn-around time of 24 hours (https://forensicfluids.com/wp-content/uploads/2024/09/Advantages-The-Forensic-Fluids-Difference-Postmortem.pdf; retrieved October18, 2025).

25.     Exhibit J is a screenshot of a PDF retrieved from Defendant Forensic Fluids' website showing a Postmortem Oral Fluid Positives Report of drugs of abuse collected on July 9, 2024 from a County Coroner's Office (https://forensicfluids.com/wp-content/uploads/2024/09/Postmortem-Report.pdf; retrieved October 18, 2025).

26.     On July 9, 2024, Koner Bulat, a Sales Support Representative for Defendant Forensic Fluids ("Mr. Bulat"), sent an email to a Coroner.  A true and correct copy of this email is attached as Exhibit K.  In the email, Mr. Bulat provides information regarding Defendant Forensic Fluids' oral drug testing services, attaching Defendant Forensic Fluids CLIA Certification of Compliance (Exhibit E); the PDF titled "How to Collect Oral Fluid Quantisal Collection Device-For Postmortem Samples" (Exhibit F); the PDF titled "Postmortem Oral Fluid Drug List" (Exhibit H); the PDF showing the Postmortem Positives Report of drugs of abuse collected on July 9, 2024 (Exhibit J); and a PDF titled "Postmortem Screening Panel, attached as Exhibit L.  Interestingly, evidencing that Defendant Forensic Fluids was well aware of Plaintiff's SteelFusion forensic toxicology laboratory, Mr. Bulat states in the email: "I understand many coroner's offices in PA were testing oral fluid with Steel Fusion Labs, who recently went out of business.  Whether you

9

were a previous customer of Steel Fusion or not, we would be happy to serve your county.  Below you will find what separates our lab from the rest."

27.    Exhibit M is a screenshot of a webpage from Defendant Forensic Fluids' website with a photo of Mr. Bulat in which PDFs of Exhibits F, G, H and I are provided regarding its oral fluid testing of drugs of abuse in postmortem subjects (https://forensicfluids.com/try-oral-fluid-testing-pm-koner/; retrieved October 18, 2025).

28.    On August 18, 2024, Defendant Forensic Fluids entered into a Confidentiality Statement and Service Agreement with Richard M. Johnson, Coroner for Lawrence County Coroner's Office in New Castle, PA.  The Agreement contains the postmortem services provided by Defendant Forensic Fluids, which includes a postmortem panel including the following drugs of abuse: amphetamine, methamphetamine, cocaine, THC, opiates, benzodiazepines, methadone, PCP, ocycodone (sic), buprenorphine, tramadol, fentanyl and kratom.  Exhibit N is a true and correct copy of this Agreement.

29.    On December 13, 2024, Mr. Bulat sent an email to Albert T. Barnes, Deputy Coroner of Schuykill County, located at 15 Alliance Street, New Philadelphia, PA 17959, pitching Defendant Forensic Fluids regarding oral fluid testing of drugs of abuse in postmortem humans. A true and correct copy of this email is attached as Exhibit O.  Attached to the email was the following: Report of results sent to the Lawrence County Coroner's Office of side-by-side comparison of blood tested at the NMS laboratory and from oral fluid tested at Defendant Forensic Fluids.  A true and correct copy is attached as Exhibit P, the PDF of the "Postmortem Oral Fluid Drug List" (Exhibit G), the PDF of "How to Collect Oral Fluid Quantisal Collection Device- For

Postmortem Samples" (Exhibit F), and Defendant Forensic Fluids' Postmortem Flyer, attached as Exhibit Q.

30.    On February 13, 2025, a Coroner sent Plaintiff an email with an attached Agreement entered into with Defendant Forensic Fluids.  A true and correct copy of this email is attached as Exhibit R and the Agreement is attached as Exhibit S.

31.    On September 18, 2025, Plaintiff received a voicemail message at SteelFusion from Defendant Lemberg, in which Defendant Lemberg stated that she wanted to talk to Plaintiff and further stated: "Let's talk- you're not going to sue me are you?"  Plaintiff called Defendant Lemberg back and left a voicemail message stating that she would like to talk to Defendant Lemberg.  Defendant Lemberg never returned Plaintiff's phone call.

## COUNT I –INFRINGEMENT OF THE '685 PATENT

32.    Plaintiff incorporates by reference the preceding paragraphs.

33.    The '685 Patent is valid and enforceable.

34.    Defendants have infringed and continue to infringe all six claims of the '684 Patent under 35 U.S.C. § 271(a), literally and/or under the Doctrine of Equivalents, by operating a forensic toxicology laboratory which provides a rapid and sensitive method to detect and quantify drugs of abuse in a postmortem human subject using oral fluid from the postmortem human subject within the United States that is covered by the claims of the '685 Patent.

35.    The preamble of claim 1 states "[a] rapid, sensitive method for the detection and quantification of non-naturally occurring drugs for forensic drug testing in a post-mortem human subject using oral fluid from the post-mortem subject."  Defendants' Accused Forensic Services

provide a rapid and sensitive method (see at least Exhibit I) to detect and quantify (see at least Exhibit G) non-naturally occurring drugs (see at least Exhibit L) in post-mortem human subjects using oral fluid from the post-mortem subject (see at least Exhibit F).

36.     Claim 1 states that the method comprises "collecting a sample of oral fluid from a post-mortem human subject; analyzing the oral fluid sample qualitatively using an enzyme-linked immunosorbent assay (ELISA) method  to detect the presence of one or more of the non-naturally occurring drugs; analyzing the oral fluid sample quantitatively using a Liquid Chromatography-Mass Spectrometry/Mass Spectrometry (LC-MS/MS) method to determine the concentration of the one or more non-naturally occurring drugs in the post-mortem human subject; and identifying the one or more non-naturally occurring drugs in the post-mortem human subject, wherein detection and quantification in oral fluid is more sensitive and faster than detection and quantification of the non-naturally occurring drugs in blood, urine, bile, and liver tissue collected from the same post-mortem human subject  using the LC-MS/MS method and the ELISA method, wherein the one or more non-naturally occurring drugs are selected from the group consisting of amphetamine, 6-acetylmorphine, alprazolam, cocaine/benzoylecgonine, buprenorphine, cannabinoids, carisoprodol, clonazepam, codeine, cyclobenzaprine, diazepam, fentanyl, hydrocodone, hydromorphone, methadone, 3,4-methylenedioxy-methamphetamine (MDMA), methamphetamine, meperidine, morphine, o-desmethyl-cis-tramadol, oxazepam, oxycodone, oxymorphone, propoxyphene, phencyclidine (PCP), tapentadol, temazepam and delta-9-tetrahydrocannabinol (THC), wherein qualitative and quantitative results are obtained in as soon as three hours."  Defendants' Accused Forensic Services include collecting a sample of oral fluid from a post-mortem human subject (see at least Exhibit F); analyzing the oral fluid qualitatively using an ELISA method (see at least Exhibit G) to detect the presence of one or more of the non-

naturally occurring drugs (see at least Exhibit L); analyzing the oral fluid sample quantitatively using a LC-MS/MS method (see at least Exhibit G) to determine the concentration of the one or more non-naturally occurring drugs in the post-mortem human subject; and identifying the one or more non-naturally occurring drugs in the post-mortem human subject (see at least Exhibit J), wherein detection and quantification in oral fluid is more sensitive and faster than detection and quantification in blood, urine, bile, and liver tissue collected from the same post-mortem human subject (see at least Exhibit I), wherein the one or more non-naturally occurring drugs (see at least Exhibit L) are selected from the group consisting of amphetamine, 6-acetylmorphine, alprazolam, cocaine/benzoylecgonine, buprenorphine, cannabinoids, carisoprodol, clonazepam, codeine, cyclobenzaprine, diazepam, fentanyl, hydrocodone, hydromorphone, methadone, 3,4-methylenedioxy-methamphetamine (MDMA), methamphetamine, meperidine, morphine, o-desmethyl-cis-tramadol, oxazepam, oxycodone, oxymorphone, propoxyphene, phencyclidine (PCP), tapentadol, temazepam and delta-9-tetrahydrocannabinol (THC) (see Exhibit L that shows a typical post-mortem drug panel Defendants identify using their Accused Forensic Services, which includes at least one of these non-naturally occurring drugs).

37.    Claim 2 states: "[t]he method of claim 1, wherein the sample of oral fluid is collected from a buccal cavity of the post-mortem human subject." Defendants' Accused Forensic Services includes collecting an oral fluid sample from a buccal cavity of a post-mortem human subject (see Exhibit F).

38.    Claim 3 states: [t]he method of claim 2, wherein the sample of oral fluid is collected from a sublingual of the buccal cavity." Defendants' Accused Forensic Services include collecting oral fluid from a sublingual region of the buccal cavity of the post-mortem human subject (see Exhibit F).

39.    Claim 4 states: [t]he method of claim 2, wherein the sample of oral fluid is collected from the submandibular gland." Defendants' Accused Forensic Services include collecting oral fluid from the submandibular gland of the post-mortem human subject (see Exhibit F, where it states: "[i]n case of rigor mortis, the pad should be placed in the buccal area between the cheek and gums, adjacent to the 2nd and 3rd molars[,]" which would include oral fluid secreted from the submandibular gland).

40.    Claim 5 states: "[t]he method of claim 1, wherein the sample of oral fluid is collected with a collection pad in about one minute to about ten minutes." Defendants' Accused Forensic Services include collecting oral fluid with a collection pad in about one to ten minutes (see Exhibit F, where it states: "wait for the indicator to turn blue or approximately 15 minutes.").

41.    Claim 6 states: [t]he method of claim 1, wherein the sample of oral fluid that is collected is about 1 mL." Defendants' Accused Forensic Services include collecting 1 mL of oral fluid with the collection pad (see Exhibit F).

42.    On information and belief, Defendants have had knowledge and notice of the '685 Patent, as well as of its own infringement of the '685 Patent.

43.    On information and belief, Defendants have had knowledge and notice of the '685 Patent, as well as of its own infringement of the '685 Patent, since at least December 19, 2025 by virtue of the present Complaint.

44.    Plaintiff has been and continues to be damaged as a direct and proximate result of the infringement of the '685 Patent by Defendants.

45.    As a consequence of the infringement of the '685 Patent, Plaintiff is entitled to recover damages in the form of, at a minimum, a reasonable royalty of all revenue resulting from Defendants' infringing activities.

46.    Defendants' infringement of the '685 Patent has been and continues to be willful.

47.    Defendants' infringement of the '685 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

### COUNT II – INFRINGEMENT OF THE '006 PATENT

48.    Plaintiff incorporates by reference the preceding paragraphs.

49.    The '006 Patent is valid and enforceable.

50.    Defendants have infringed and continue to infringe all six claims of the '006 Patent under 35 U.S.C. § 271(a), literally and/or under the Doctrine of Equivalents, by operating a forensic toxicology laboratory which provides a rapid and sensitive method to detect and quantify drugs of abuse in a postmortem human subject using oral fluid from the postmortem human subject within the United States that is covered by the claims of the '006 Patent.

51.    The preamble of claim 1 states "[a] rapid, sensitive method for the detection and quantification of non-naturally occurring drugs for forensic drug testing in a post-mortem human subject using oral fluid from the post-mortem human subject."  Defendants' Accused Forensic Services provide a rapid and sensitive method (see at least Exhibit I) to detect and quantify (see at least Exhibit G) non-naturally occurring drugs (see at least Exhibit L) in post-mortem human subjects using oral fluid from the post-mortem human subject (see at least Exhibit F).

52.     Claim 1 states that the method comprises "collecting a sample of oral fluid from a post-mortem human subject; analyzing the oral fluid sample quantitatively using a Liquid Chromatography-Mass Spectrometry/Mass Spectrometry (LC-MS/MS) method to determine concentration of the one or more non-naturally occurring drugs in the post-mortem human subject; and identifying the one or more non-naturally occurring drugs in the post-mortem human subject, wherein detection and quantification in oral fluid is more sensitive and faster than detection and quantification of the non-naturally occurring drugs in blood, urine, bile, and liver tissue collected from the same post-mortem human subject using the LC-MS/MS method and the ELISA method, wherein the one or more non-naturally occurring drugs are selected from the group consisting of 6-acetylmorphine, alprazolam, amphetamine, buprenorphine, carisoprodol, clonazepam, cocaine/benzoylecgonine, codeine, cyclobenzaprine, diazepam, fentanyl, hydrocodone, hydromorphone, ketamine, lorazepam, meperidine, methadone, 3,4-methamphetamine, methylenedioxy-methamphetamine (MDMA), methylphenidate, midazolam, morphine, naltrexone, o-desmethyl-cis-tramadol, oxazepam, oxycodone, oxymorphone, phencyclidine (PCP), propoxyphene, quetiapine, tapentadol, temazepam, delta-9-tetrahydrocannabinol (THC) and triazolam, and wherein quantitative results are obtained in as soon as three hours." Defendants' Accused Forensic Services include collecting a sample of oral fluid from a post-mortem human subject (see at least Exhibit F); analyzing the oral fluid sample quantitatively using a LC-MS/MS method (see at least Exhibit G) to determine the concentration of the one or more non-naturally occurring drugs in the post-mortem human subject; and identifying the one or more non-naturally occurring drugs in the post-mortem human subject (see at least Exhibit J), wherein detection and quantification in oral fluid is more sensitive and faster than detection and quantification in blood, urine, bile, and liver tissue collected from the same post-mortem human

subject (see at least Exhibit I), wherein the one or more non-naturally occurring drugs (see at least Exhibit L) are selected from the group consisting of 6-acetylmorphine, alprazolam, amphetamine, buprenorphine, carisoprodol, clonazepam, cocaine/benzoylecgonine, codeine, cyclobenzaprine, diazepam, fentanyl, hydrocodone, hydromorphone, ketamine, lorazepam, meperidine, methadone, 3,4-methamphetamine, methylenedioxy-methamphetamine (MDMA), methylphenidate, midazolam, morphine, naltrexone, o-desmethyl-cis-tramadol, oxazepam, oxycodone, oxymorphone, phencyclidine (PCP), propoxyphene, quetiapine, tapentadol, temazepam, delta-9-tetrahydrocannabinol (THC) and triazolam (see Exhibit L that shows a typical post-mortem drug panel Defendants identify using their Accused Forensic Services, which includes at least one of these non-naturally occurring drugs).

53.    Claim 2 states: "[t]he method of claim 1, wherein the sample of oral fluid is collected from a buccal cavity of the post-mortem human subject."  Defendants' Accused Forensic Services includes collecting an oral fluid sample from a buccal cavity of a post-mortem human subject (see Exhibit F).

54.    Claim 3 states: [t]he method of claim 2, wherein the sample of oral fluid is collected from a sublingual region of the buccal cavity."  Defendants' Accused Forensic Services include collecting oral fluid from the sublingual region of the buccal cavity of the post-mortem human subject (see Exhibit F).

55.    Claim 4 states: [t]he method of claim 2, wherein the sample of oral fluid is collected from submandibular gland."  Defendants' Accused Forensic Services include collecting oral fluid from the submandibular gland of the post-mortem human subject (see Exhibit F, where it states: "[i]n case of rigor mortis, the pad should be placed in the buccal area between the cheek and gums,

adjacent to the 2nd and 3rd molars[,]" which would include oral fluid secreted from the submandibular gland).

56.     Claim 5 states: "[t"he method of claim 1, wherein the sample of oral fluid is collected with a collection pad in about one minute to about ten minutes." Defendants' Accused Forensic Services include collecting oral fluid with a collection pad in about one to ten minutes (see Exhibit F, where it states: "wait for the indicator to turn blue or approximately 15 minutes.").

57.     Claim 6 states: [t]he method of claim 1, wherein the sample of oral fluid that is collected is about 1 mL." Defendants' Accused Forensic Services include collecting 1 mL of oral fluid with the collection pad (see Exhibit F).

58.     On information and belief, Defendants have had knowledge and notice of the '006 Patent, as well as of its own infringement of the '006 Patent.

59.     On information and belief, Defendants have had knowledge and notice of the '006 Patent, as well as of its own infringement of the '006 Patent, since at least December 19, 2025 by virtue of the present Complaint.

60.     Plaintiff has been and continues to be damaged as a direct and proximate result of the infringement of the '006 Patent by Defendants.

61.     As a consequence of the infringement of the '006 Patent, Plaintiff is entitled to recover damages in the form of, at a minimum, a reasonable royalty of all revenue resulting from Defendants' infringing activities.

62.     Defendants' infringement of the '006 Patent has been and continues to be willful.

63.    Defendants' infringement of the '006 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT III – INFRINGEMENT OF THE '811 PATENT

64.    Plaintiff incorporates by reference the preceding paragraphs.

65.    The '811 Patent is valid and enforceable.

66.    Defendants have infringed and continue to infringe all six claims of the '811 Patent under 35 U.S.C. § 271(a), literally and/or under the Doctrine of Equivalents, by operating a forensic toxicology laboratory which provides a rapid and sensitive method to quantify drugs of abuse in a postmortem human subject using oral fluid from the postmortem human subject within the United States that is covered by the claims of the '811 Patent.

67.    The preamble of claim 1 states "[a] rapid, sensitive forensic drug testing method for quantification of one or more non-naturally occurring drugs in a post-mortem human subject suspected of dying from taking a drug overdose using oral fluid from the post-mortem human subject."  Defendants' Accused Forensic Services provide a rapid and sensitive method (see at least Exhibit I) quantify (see at least Exhibit G) non-naturally occurring drugs (see at least Exhibit L; ) in post-mortem human subjects using oral fluid from the post-mortem human subject (see at least Exhibit F; it logically follows that testing a post-mortem human subject for non-naturally occurring drugs is undertaken because of a suspicion that the post-mortem subject died from a drug overdose).

68.    Claim 1 states that the method comprises "collecting a sample of oral fluid from the post-mortem human subject suspected of dying from taking a drug overdose; analyzing the

sample of oral fluid quantitatively using a Liquid Chromatography-Mass Spectrometry/Mass Spectrometry (LC-MS/MS) method to determine a concentration of the one or more non-naturally occurring drugs in the post-mortem human subject; and identifying one or more non-naturally occurring drugs in the post-mortem human subject, wherein detection and quantification of one or more non-naturally occurring drugs in the sample of oral fluid from the post-mortem human subject is more sensitive and faster than the detection and quantification of one or more non-naturally occurring drugs in a biological matrix selected from the group consisting of blood, urine, bile, and liver tissue in the same post-mortem human subject suspected of dying from taking a drug overdose using the same LC-MS/MS method, wherein the one or more non-naturally occurring drugs are selected from the group consisting of 6-acetylmorphine, alprazolam, codeine, morphine, carisoprodol, clonazepam, oxycodone, meperidine, cyclobenzaprine, hydrocodone, o-desmethyl-cis-tramadol, oxymorphone, buprenorphine, gabapentin, naloxone, acetaminophen, ethyl sulfate, ethyl glucuronide, fentanyl, amphetamine, methadone, and benzoylecgonine, and wherein quantitative results are obtained in about three hours."  Defendants' Accused Forensic Services include collecting a sample of oral fluid from a post-mortem human subject suspected of dying from taking a drug overdose (see at least Exhibit F and Exhibit); analyzing the oral fluid sample quantitatively using a LC-MS/MS method (see at least Exhibit G) to determine the concentration of the one or more non-naturally occurring drugs in the post-mortem human subject; and identifying the one or more non-naturally occurring drugs in the post-mortem human subject (see at least Exhibit J), wherein quantification in oral fluid is more sensitive and faster than detection and quantification in biological matrices such as blood, urine, bile, and liver tissue collected from the same post-mortem human subject (see at least Exhibit I), wherein the one or more non-naturally occurring drugs (see at least Exhibit L) are selected from the group consisting

of 6-acetylmorphine, alprazolam, codeine, morphine, carisoprodol, clonazepam, oxycodone, meperidine, cyclobenzaprine, hydrocodone, o-desmethyl-cis-tramadol, oxymorphone, buprenorphine, gabapentin, naloxone, acetaminophen, ethyl sulfate, ethyl glucuronide, fentanyl, amphetamine, methadone, and benzoylecgonine (see Exhibit L that shows a typical post-mortem drug panel Defendants identify using their Accused Forensic Services, which includes at least one of these non-naturally occurring drugs).

69.    Claim 2 states: "[t]he method of claim 1, wherein the sample of oral fluid is collected from a buccal cavity of the post-mortem human subject." Defendants' Accused Forensic Services includes collecting an oral fluid sample from a buccal cavity of a post-mortem human subject (see Exhibit F).

70.    Claim 3 states: [t]he method of claim 2, wherein the sample of oral fluid is collected from a sublingual region of the buccal cavity." Defendants' Accused Forensic Services include collecting oral fluid from the sublingual region of the buccal cavity of the post-mortem human subject (see Exhibit F).

71.    Claim 4 states: [t]he method of claim 2, wherein the sample of oral fluid is collected from a submandibular gland." Defendants' Accused Forensic Services include collecting oral fluid from the submandibular gland of the post-mortem human subject (see Exhibit F, where it states: "[i]n case of rigor mortis, the pad should be placed in the buccal area between the cheek and gums, adjacent to the 2nd and 3rd molars[,]" which would include oral fluid secreted from the submandibular gland).

72.    Claim 5 states: "[t"he method of claim 1, wherein the sample of oral fluid is collected with a collection pad in about one minute to about ten minutes." Defendants' Accused

Forensic Services include collecting oral fluid with a collection pad in about one to ten minutes (see Exhibit F, where it states: "wait for the indicator to turn blue or approximately 15 minutes.").

73.    Claim 6 states: [t]he method of claim 1, wherein the sample of oral fluid that is collected is about 1 millimeter (mL)."  Defendants' Accused Forensic Services include collecting 1 mL of oral fluid with the collection pad (see Exhibit F).

74.    On information and belief, Defendants have had knowledge and notice of the '811 Patent, as well as of its own infringement of the '811 Patent.

75.    On information and belief, Defendants have had knowledge and notice of the '811 Patent, as well as of its own infringement of the '811 Patent, since at least December 19, 2025 by virtue of the present Complaint.

76.    Plaintiff has been and continues to be damaged as a direct and proximate result of the infringement of the '811 Patent by Defendants.

77.    As a consequence of the infringement of the '811 Patent, Plaintiff is entitled to recover damages in the form of, at a minimum, a reasonable royalty of all revenue resulting from Defendants' infringing activities.

78.    Defendants' infringement of the '811 Patent has been and continues to be willful.

79.    Defendants' infringement of the '811 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    That Defendants have infringed each of the claims in each of the Asserted Patents;

B.    That Defendants' infringement of the Asserted Patents has been willful;

C.    That Plaintiff be awarded all damages adequate to compensate Plaintiff for Defendants' past infringement and any continuing or future infringement of the Asserted Patents up until the date such judgment is entered, including pre- and post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284;

D.    That any award of damages be enhanced under 35 U.S.C. § 284 as result of Defendants' willful infringement;

E.    That this case be declared an exceptional case within the meaning of 35 U.S.C.§ 285 and that Plaintiff be awarded attorney fees, costs, and expenses incurred in connection with this action;

F.    That Plaintiff be awarded either a permanent injunction, or, at least, a compulsory ongoing licensing fee; and

G.    That Plaintiff be awarded such other and further relief at law or in equity as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands that the issues in this case be tried by a jury.


Dated: December 19, 2025                    Respectfully submitted,

/s/*Gwen R. Acker Wood*
Gwen R. Acker Wood
PA State Bar No. 81087
Acker Wood Intellectual Property Law, LLC
4981 McKnight Road
Pittsburgh, PA 15237

Phone: (412) 486-1038
Fax: (412) 487-2837
grwood@ackerwoodiplaw.com

Christopher E. Tracy (P46738)
Matthew E. Sierawski (P83524)
Warner Norcross & Judd LLP
150 Ottawa Avenue, NW, Suite 1500
Grand Rapids, Michigan 49503
616.752.2000
ctracy@wnj.com
msierawski@wnj.com

*Attorneys for Plaintiff*

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

/s/*Gwen R. Acker Wood*
Gwen R. Acker Wood
PA State Bar No. 81087
Acker Wood Intellectual Property Law, LLC
4981 McKnight Road
Pittsburgh, PA 15237
Phone: (412) 486-1038
Fax: (412) 487-2837
grwood@ackerwoodiplaw.com

Christopher E. Tracy (P46738)
Matthew E. Sierawski (P83524)
Warner Norcross & Judd LLP
150 Ottawa Avenue, NW, Suite 1500
Grand Rapids, Michigan 49503
616.752.2000
ctracy@wnj.com
msierawski@wnj.com

*Attorneys for Plaintiff*
